Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| CONSEJO DE TITULARES DEL CONDOMINIO PASEO DEL REY **Apelante** | | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce |
|---|---|---|
| V. | KLAN202500064 | Civil. Núm. PO2021CV02473 Sobre: Violación de Contrato de Seguros; Prácticas Desleales de Seguros |
| UNIVERSAL INSURANCE COMPANY **Apelado** | | |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

**Hernández Sánchez, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 7 de marzo de 2025.

El 27 de enero de 2025, el Consejo de Titulares del Condomonio Paseo del Rey (el Consejo o apelante) compareció ante nos mediante un *Recurso de Apelación* y solicitó la revocación de una *Sentencia* que se dictó el 2 de diciembre de 2024 y se notificó el 5 de diciembre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó Universal Insurance Company (Universal o apelada) y No Ha Lugar a la *Solicitud sobre Sentencia Sumaria y Sentencia Declaratoria* que presentó el Consejo. Así pues, desestimó, con perjuicio, la Demanda presentada.

Por los fundamentos que expondremos a continuación, *confirmamos* el dictamen recurrido.

I.

El 23 de diciembre de 2022, el Consejo presentó una *Demanda Enmendada* sobre violación de contrato de seguros, prácticas

desleales de seguro y daños contractuales contra Universal.[1] En esta alegó que, el 7 de septiembre de 2019, Universal emitió una póliza de seguros núm. 09-561-000607 (póliza comercial) a favor del Consejo bajo el nombre Asociación de Residentes Condominio Paseo del Rey. Expresó que la referida póliza cubría propiedad comercial, responsabilidad pública, crimen comercial y fidelidad. De igual forma, indicó que, para esa misma fecha, a saber, el 7 de septiembre de 2019, Universal emitió una segunda póliza núm. DOL990-00824 (póliza de directores) a favor del Consejo también bajo el nombre Asociación de Residentes Condominio Paseo del Rey. Explicó que este tipo de póliza era una de "*Management and Executive Protective Insurance for Private Companies*" y que cubría la responsabilidad de los directores y oficiales de la corporación.

Por otro lado, manifestó que, entre los días 28 y 29 de octubre de 2019, los miembros de la Junta de Directores del Consejo presentaron sus renuncias a los cargos electivos y que ya para el 13 de noviembre de 2019, se escogió a una nueva Junta de Directores. Adujo que, durante la transición de la nueva junta, el Consejo advino en conocimiento de que algunos de los miembros de la pasada junta realizaron transacciones fraudulentas y/o deshonestas tales como hurto y pagos a terceros en violación a la Ley de Condominios. Sostuvo que los actos antes mencionados causaron perdidas que se estimaban en ciento treinta mil ($130,000.00) dólares.

Argumentó que estas pérdidas estaban cubiertas por las pólizas expedidas a favor del Consejo por lo que le enviaron una reclamación a Universal. Sin embargo, indicó que, Universal negó la reclamación y que se limitó a ajustar el caso bajo la póliza de directores. Debido a ello, concluyó que Universal había actuado en

---

[1] Véase, Entrada Núm. 33, SUMAC.

contra de sus propias directrices y normas por no haber evaluado la póliza comercial que, según ellos, cubría los actos deshonestos cometidos por los miembros de la Junta de Directores. Específicamente expresó que, Universal había incurrido en incumplimiento de contrato, dolo, negligencia y que debía indemnizarles $200,000.00 por concepto de daños ya que al denegar la reclamación los obligó a disminuir ciertos servicios e imponer cuotas y/o derramas adicionales.

En respuesta, el 30 de marzo de 2023, Universal presentó su *Contestación a Demanda Enmendada* negando la mayoría de las alegaciones en su contra.[2] Particularmente puntualizó que, ninguna de las pólizas emitidas a favor del Consejo cubría el tipo de reclamación presentada. Además, detalló las exclusiones de la póliza comercial y sus límites de cubierta.

Tras varios trámites procesales que no son pertinentes discutir, el 6 de agosto de 2024, el Consejo presentó una *Solicitud sobre Sentencia Sumaria y Sentencia Declaratoria.*[3] En primer lugar, enumeró los siguientes hechos que, a su juicio, no estaban en controversia:

1. El Condominio Paseo del Rey está adscrito a la Ley de Propiedad Horizontal (Anejo I, Deposición del Sr. Carlos E. Ramos Suarez Pág. 24, línea 1-4)

2. La Asociación de Residentes Condominio Paseo del Rey es el nombre incorrecto del Consejo de Titulares del Condominio Paseo de Rey. La Asociación de Residentes es lo mismo que el Consejo del Titulares del Condominio Paseo del Rey. (Anejo I, Deposición del Sr. Carlos E. Ramos Suárez Pág. 33, líneas 8-17)

3. Universal Insurance Company Inc. suscribió la póliza número DOL 990-00824 a favor de la Asociación de Residentes Condominio Paseo del Rey, con dirección en 3704 Paseo del Rey, Blvd. Miguel Pou, Ponce PR 00716. La fecha de efectividad de la póliza es del 7 de septiembre de 2019 hasta el 7 de septiembre de 2020. La referida póliza provee cubierta tipo "Directors and Officers Liability (Individual); Directors and Officers Liability (Reimbursement). (Anejo II).

---

[2] Véase, Entrada Núm. 37, SUMAC.
[3] Véase, págs. 51-63 del apéndice del recurso.

4. Universal Insurance Company Inc. suscribió la póliza número 09-561-000607119-03/000 a favor de la Asociación de Residentes Condominio Paseo del Rey. La dirección del asegurado es 3704 Paseo del Rey, Blvd. Miguel Pou, Ponce PR 00716. La fecha de efectividad de la póliza es del 7 de septiembre de 2019 hasta el 7 de septiembre de 2020. La póliza provee cubierta para propiedad comercial, responsabilidad pública y crimen comercial y fidelidad. (Anejo III).

5. La póliza sobre Crimen y Fidelidad está compuesta por los siguientes endosos:

   1. CR0021 08-13 Commercial Crime Coverage Form (Loss Sustained Form)
   2. CR0730 10-10 Exclusion of Terrorism
   3. CR0195 04-11 Puerto Rico Changes- Include Nonbinding Arbitration
   4. CR0268 07-10 Puerto Rico Changes. (Anejo III).

6. El endoso CR0021 08-13 sobre "Commercial Crime Coverage Form" (Loss Sustained Form) en entre sus incisos dispone lo siguiente:

   A.1 Employee Theft
   We Will pay for loss or damage to "money", "securities" and "other property" resulting directly from theft committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

   For the purposes of this Insuring Agreement, "theft" shall also include forgery.

   A. 5. Outside the Premises
   We will pay for:
   a. Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

   F. Definitions

   7. "Employee""
   a. Means:
   (8) Any natural person who is your "manager", director, or trustee while:
   (a) Performing acts within the scope of the usual duties of an "employee";
   or
   (b) Acting as a member or any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

   15. "Messenger" means you, or your relative, or any of your partners or "members", or nay "employe" while having care and custody of property outside the "premises".

23. "Theft" means the unlawful taking of property to the deprivation of the insured. "5 (Anejo III).

7. Para los días 28 y 29 de octubre de 2019, los miembros de la Junta de Directores del Consejo de Titulares del Condominio Paseo del Rey presentaron su renuncia a los cargos electivos. (Anejo IV).

8. El 29 de octubre de 2019, se convocó asamblea extraordinaria para escoger una nueva junta de directores. (Anejo V).

9. El 13 de noviembre de 2019, el Consejo de Titulares del Condominio Paseo del Rey celebró Asamblea Extraordinaria para escoger su nueva junta de directores. (Anejo VI).

10. La nueva junta de directores se compuso de las siguientes personas, a saber:

> (1) Orlando Torres Rodriguez- Presidente
> (2) Carlos Ramos Suarez- Vicepresidente
> (3) Lizette Colón Fazzi- Tesorera
> (4) Joanna Daleccio Morales- Subtesorera
> (5) Pilar Muñoz Nazario- Secretaria
> (6) Evelyn González Vargas-Vocal
> (7) Martin Toro López- Vocal. (Anejo VI).

11. Carlos García y Reinaldo Flores mientras fungieron como miembros de la Junta de Directores emitieron varios cheques a nombre de "cash" o "petty cash" (Petty Cash). (ANEJO I- Deposición del Sr. Carlos E. Ramos Suárez, Pág. 16, línea 14-24 y 17, líneas 1-14; Anejo VII- Cheques)

12. Los cheques emitidos pertenecían a la cuenta de banco del Consejo de Titulares del Condominio Paseo del Rey. (Anejo 1-Deposicion del Sr. Carlos E. Ramos Suárez Pág. 16. Línea 14-24).

13. Los cheques no fueron aprobados por el Consejo. (Anejo I- Deposición del Sr. Carlos E. Ramos Suárez Pág. 16, línea 14-24).

14. Los cheques no tienen ningún tipo de explicación. (Anejo I-Deposición del Sr. Carlos E. Ramos Suárez Pág. 16, línea 14-24)

15. Carlos García endosó a su persona los cheques emitidos a nombre del portador. (Anejo VII).

16. Carlos García y Reinaldo Flores realizaron pagos a la Autoridad de Energía Eléctrica ("AEE") para la cuenta número 2386451000. (Anejo VIII).

17. La cuenta número 2386451000 pertenece al contador del apartamento propiedad del señor Carlos García. (Anejo IX).

18. Los pagos se realizaron utilizando la chequera perteneciente al Consejo de Titulares del Condominio Paseo del Rey. (Anejo VIII).

19. El Consejo de Titulares no permite que miembros de la Junta retiren fondos para su uso personal. (ANEJO I - Deposición del Sr. Carlos E. Ramos Suárez Pág. 36, línea 8-12).

20. El dinero que se retiró como "petty cash" no se utilizó para pagar deudas del Consejo. (Anejo I- Deposición del Sr. Carlos E. Ramos Suárez Pág. 36, línea 13-24 y 37, línea 1-3).

21. El dinero que utilizó el señor Carlos García de la cuenta de banco del Consejo de Titulares del Condominio Paseo del Rey, lo hizo de forma ilegal y en detrimento del Consejo de Titulares. (ANEJO I- Deposición del Sr. Carlos E. Ramos Suárez Pág.38, línea 7-19).

22. Los dineros retirados por los señores Carlos García y Rey Flores no estaban presupuestados por el Consejo de Titulares. (ANEJO I- Deposición del Sr. Carlos E. Ramos Suárez, Pág. 39, línea 1-16.

23. El 19 de noviembre de 2019, el Consejo de Titulares del Condominio Paseo del Rey, presentó una reclamación a Universal Insurance Company por las pérdidas sufridas como resultado de los actos deshonestos cometidos por algunos miembros de la Junta (Anejo X).

24. El 26 de noviembre de 2019, el Sr. Hans Rodríguez Fuentes, remitió carta al Consejo de Titulares del Condominio Paseo del Rey, denegando la reclamación. (ANEJO XI).

25. "Universal" limitó el ajuste de la reclamación únicamente considerando la póliza de Directores y Oficiales que había emitido a favor del Consejo de Titulares. No revisó la póliza de "Comercial Crime" previo a denegar la reclamación. (ANEJO XI y ANEJO XII- Transcripción de Deposición del Sr. José Ortiz Rodríguez, pág. 20, línea 2-4).

26. Entre las razones levantadas por Universal para denegar la reclamación, se mencionó la Sección I de la póliza de directores, cual no cubre actos fraudulentos y/o deshonestos. (ANEJO XI, pág. 4).

27. La política institucional de "Universal", es que una vez reciba una reclamación deben revisar y analizar todas las pólizas expedidas a favor de asegurado. (ANEJO XII- Transcripción de Deposición del señor José Ortiz Rodríguez, pág. 19, línea 12-25 y pág. 20, línea 1-22).

Luego, indicó que, tomando en consideración los hechos antes expuestos, la prueba presentada y el derecho aplicable, procedía dictar sentencia sumaria a los efectos de determinar que los actos deshonestos por parte del Sr. Carlos García (señor García),

presidente de la pasada Junta de Directores del Consejo, estaban cubiertos bajo la póliza comercial.

Por su parte, ese mismo día, a saber, el 6 de agosto de 2024, Universal presentó su *Moción de Sentencia Sumaria.*[4] En esta, enumeró treinta y ocho (38) hechos que, a su juicio, no estaban en controversia. Estos leen como sigue:

1. En su demanda, la parte demandante, el Consejo de Titulares del Condominio Paseo del Rey (de aquí en adelante "Consejo de Titulares"), alega que Universal Insurance Company (de aquí en adelante "Universal") incumplió los términos y condiciones de la Póliza de "Commercial Crime" Núm. 09-561-000607119/000 expedida a su favor. **Véase SUMAC Núm. 33.**

2. Específicamente, la parte demandante alega que Universal incumplió los términos y condiciones de dicha póliza al denegar cubierta por la pérdida de $130,000.00 alegadamente sufrida por el Consejo de Titulares a causa de unas alegadas transacciones fraudules y hurto cometidas por pasados miembros de la Junta de Directores del Consejo de Titulares. **Véase SUMAC Núm. 33.**

3. Según la Demanda, "Universal Insurance Company ha incumplido con sus obligaciones contractuales al amparo de la póliza comercial expedida a favor de la Asociación de Residentes Condominio Paseo del Rey, que estaba en vigencia a la fecha de los eventos que causaron la pérdida". **Véase SUMAC Núm. 33.**

4. Alega la parte demandante que estos eventos de supuesto hurto constituyen un "evento cubierto por la póliza según lo define el concepto 'employee theft'". **Véase SUMAC Núm. 33.**

5. Así pues, los demandantes solicitan que "[a]l amparo de la póliza comercial expedida y/o las obligaciones legales que emanan en el Código de Seguros, y/o el deber de actuar de buena fe, Universal Insurance viene obligada a cubrir en su totalidad la pérdida sufrida por la parte demandante cuyo monto actualizado asciende a sobre $130,000.00." **Véase SUMAC Núm. 33.**

6. La parte demandante alega que Universal, al denegar cubierta por la reclamación alegada en la Demanda, incurrió en incumplimiento doloso de los términos y condiciones de la Póliza de "Commercial Crime" Núm. 09-561-000607119/000 expedida a favor del Consejo de Titulares. **Véase SUMAC Núm. 33.**

7. Igualmente, la parte demandante solicita indemnización monetaria por los gastos incurridos y daños económicos

---

[4] Íd., págs. 173-188.

sufridos a consecuencia de la denegatoria de cubierta por parte de Universal. **Véase SUMAC Núm. 33.**

8. Al momento de los hechos en el presente caso, Universal Insurance Company había expedido la Póliza de Seguros número 09-561-000607119-3/00, para el periodo del 7 de septiembre del 2019 al 7 de septiembre de 2020, a favor del Consejo de Titulares del Condominio Paseo del Rey, el cual aparece como asegurado bajo el nombre de Asociación de Residentes Condominio Paseo del Rey. **Véase Exhibit #1, Porciones Pertinentes de Póliza.**

9. La Póliza 09-561-000607119-3/000 contiene un "Commercial Crime Coverage Form" que establece lo siguiente: "Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition E.1.k. or E.1.1., which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss E.1.g:" **Véase Exhibit #2, Commercial Coverage Form, Pág. 1.**

10. La Póliza 09-561-000607119-3/000 define "you" y "your" como "the Named Insured shown in the Declarations". **Véase Exhibit #2, Commercial Coverage Form, Pág. 1.**

11. En su sección, A.1, el "Commercial Crime Coverage Form" establece lo siguiente: "We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons. For the purposes of this Insuring Agreement, "theft" shall alsoinclude forgery.". **Véase Exhibit #2, Commercial Coverage Form, Pág. 1.**

12. La Póliza 09-561-000607119-3/000 define "employee" como "(1) Any natural person: (a)While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee"; (b) Whom you compensate directly by salary, wages or commissions; and (c) Whom you have the right to direct and control while performing services for you" o "(2) Any natural person who is furnished temporarily to you: (a) To substitute for a permanent "employee" as defined in Paragraph 7.a.(1), who is on leave; or (b) To meet seasonal or short-term work load conditions; (3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph 7.a.(2); (4) Any natural person who is: (a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an

independent contractor of any "employee benefit plan"; or (b) Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan"; (5) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained by you as a consultant while performing services for you; (6) Any natural person who is a guest student or intern pursuing studies or duties; (7) Any natural person employed by an entity merged or consolidated with you prior to the effective date of this Policy; and (8) Any natural person who is a "manager", director or trustee while: (a) Performing acts within the scope of the usual duties of an "employee"; or (b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf". **Véase Exhibit #2, Commercial Coverage Form, Pág. 13.**

13. La Póliza 09-561-000607119-3/000 define "Manager" como "a natural person serving in a directional capacity for a limited liability company". **Véase Exhibit #2, Póliza, Pag.**

14. La Póliza 09-561-000607119-3/000 define "Member" como "an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager"". **Véase Exhibit #2, Commercial Coverage Form, Pág. 14.**

15. La Póliza 09-561-000607119-3/000 define "Occurrence" como "a. Under Insuring Agreement A. 1.: (1) An individual act; (2) The combined total of all separate acts whether or not related; or (3) A series of acts whether or not related; committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition E.1.k or E.1.I". **Véase Exhibit #2, Commercial Coverage Form, Pág. 15.**

16. La Póliza 09-561-000607119-3/000 define "Theft" como "the unlawful taking of property to the deprivation of the insured". **Véase Exhibit #2, Commercial Coverage Form, Pág. 15.**

17. Como parte de sus exclusiones, el Commercial Coverage Form de la Póliza 09-561-000607119-3/000 establece lo siguiente: This insurance those not cover:

a. Acts Committed By You, Your Partners or Your Members
Loss resulting from "theft" or any other dishonest act committed by:
   1. You; or
   2. Any of your partners or "members";

   Whether acting alone or in collusion with other persons.

b. Acts Committed by Your Employees Learned of by You Prior to the Policy Period

Loss caused by and "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. Acts Committed by Your Employees, Managers, Directors, Trustees or Representatives

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives"

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

Except when covered under Insuring Agreement A.1. **Véase Exhibit #2, Commercial Coverage Form, Pág. 2-4.**

18. El señor Orlando Torres fue electo presidente del Consejo de Titulares en el 2019, tras la incumbencia del señor Carlos García, el anterior presidente del Consejo de Titulares. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág.31, L. 1-25; Pag.32, L. 1-25; Pag. 33, L. 1-25.**

19. El Consejo de Titulares, bajo el mando de Orlando Torres, es quién lleva a cabo la reclamación de cubierta alegada en la Demanda a Universal Insurance Company. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 47, L. 1-25; Pág. 48, L. 1-25.**

20. Según Orlando Torres, las imputaciones de transacciones fraudulentas y hurto alegadas en la Demanda se hacen en contra del señor Carlos García por actos cometidos durante su incumbencia como presidente del Consejo de Titulares para los años 2017 a 2019. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 31, L. 1-25; Pág. 32, L. 1-25.**

21. El señor Orlando Torres es quién alerta a la oficina o "firma" de contabilidad contratada por la directiva del Consejo de Titulares de las supuestas irregularidades financieras cometidas por el señor Carlos García. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 39, L. 1-25; P. 40, L. 1-25; P. 41, L. 1-25.**

22. La oficina o "firma" de contabilidad contratada por la directiva del Consejo de Titulares, bajo el mando de Orlando Torres, era "Sixto Reyes Accounting". **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 41, L. 1-25.**

23. Según Orlando Torres, "Sixto Reyes Accounting" levó a cabo una investigación de las irregularidades financieras imputadas al señor Carlos García. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 41, L. 1-25; Pág. 42, L. 1-25; P. 43, L. 1-25; P. 44, L. 1-25.**

24. El señor Carlos Garcia no recibía sueldo ni renumeración por sus labores como presidente y vicepresidente del Consejo de Titulares del Condominio Paseo del Rey. **Véase Exhibit H3, Transcripción de Deposición del señor Orlando Torres, Pág. 37, L. 1-25; P.38, L.1-25.**

25. El señor Carlos Garcia no tenía supervisor ni existía un puesto superior al suyo en la directiva del Consejo de Titulares. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 38, L. 1-25; Pág. 39, L.25.**

26. El señor Carlos García, como presidente del Consejo de Titulares, era quién les impartia instrucciones a los empleados del Consejo de Titulares y la Asociación de Residentes y quién estaba encargado de presidir estos cuerpos. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 38, L. 1-25; Pág. 39, L. 1-25.**

27. El señor Carlos García no participaba como presidente del Consejo de Titulares como parte de un contrato con una compañía encargada de la administración del edificio. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 37, L. 1-25; P. 38, L. 1-25.**

28. El señor Carlos García no era empleado del Consejo de Titulares. **Véase Exhibit #4, Transcripción de Deposición de Carlos E. Ramos, Pág. 20, L. 1-25; Pág. 27, L. 1-25; Pág.28, L. 1-25.**

29. La firma de contabilidad Sixto Reyes Accounting nunca le expresó o le confirmó al Consejo de Titulares que el señor Carlos García en efecto robó o hurtó dinero perteneciente al Consejo o a la Asociación de Residentes. **Véase Exhibit #3, Transcripción de**

**Deposición del señor Orlando Torres, Pág. 41, L. 1-25; Pág. 42, L. 1-25; P. 43, L. 1-25; P. 44, L. 1-25.**

30. La firma de contabilidad Sixto Reyes Accounting solo expresó que había una situación económica precaria en cuanto a las finanzas del edficio Paseo del Rey. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 41, L. 1-25; Pág. 42, L. 1-25; P. 43, L. 1-25; P. 44, L. 1-25.**

31. El Consejo de Titulares, bajo el mando de Orlando Torres, hizo una querella a la Policía para que estos investigaran las supuestas irregularidades financieras cometidas por el señor Carlos García. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág-51, L. 1-25; Pág. 52, L. 1-25; Véase Exhibit #5, Informe de la Policía.**

32. La Policia de Puerto Rico no presentó cargos criminales en contra del señor Carlos García. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 52, L. 1-25.**

33. El Consejo de Titulares, bajo el mando de Orlando Torres, no contrató a una compañía para llevar a cabo un análisis forense independiente de las imputaciones hechas en contra de Carlos García. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág.57, L. 1-25.**

34. Según Orlando Torres, el hurto cometido por Carlos García consistió en que este cambió sobre cien cheques asignados a "petty cash" sin haber eidencia de pago. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 59, L. 1-25; Pág. 60, L. 1-25, Pág. 61, L. 1-25; Pág. 62, L. 1-25.**

35. Según Orlando Torres, las transacciones fraudulentas cometidas por Carlos García consistieron en utilizar dinero del Consejo de Titulares para pagar servicios eléctricos de un apartamento en particular, sin aprobación del Consejo. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 59, L. 1-25; Pág. 60, L. 1-25, Pág. 61, L. 1-25; Pág. 62, L. 1-25.**

36. El Condominio Paseo del Rey está adscrito al régimen de la Ley de Propiedad Horizontal. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 63, L. 1-25.**

37. Orlando Torres fue quién procuró la Póliza a nombre del Consejo de Titulares. **Véase Exhibit #3,**

**Transcripción de Deposición del señor Orlando Torres, Pág. 36, L. 1-25; P. 37, L. 1-25.**

38. Según Orlando Torres, cuando Carlos García era presidente del Consejo de Titulares, este era asegurado bajo la Póliza. **Véase Exhibit #3, Transcripción de Deposición del señor Orlando Torres, Pág. 36, L. 1-25; P. 37, L. 1-25.**

Luego de exponer el derecho aplicable y tomando en consideración los hechos antes expuestos y la prueba documental presentada, Universal concluyó que, el señor García, en calidad de presidente de la pasada Junta de Directores del Consejo, no era un empleado del Consejo según definido en el *Comercial Crime Coverage Form*" de la Póliza. Además, argumentó que aun suponiendo que el señor García cometió "theft" o hurto según definido bajo la póliza, ello no se trataba de un evento u "ocurrence" bajo la Póliza como cuestión de derecho. Sostuvo que el Consejo como quiera no contaba con evidencia suficiente para establecer que el señor Rivera había cometido "theft" o hurto según definido en el "insuring agreement" del *Commercial Coverage Form* de la póliza. Por último, reafirmó que la reclamación estaba expresamente excluida bajo el *Commercial Crime Coverage Form* de la póliza por lo que se debía dictar sentencia sumaria y, en consecuencia, desestimar la Demanda con perjuicio.

En respuesta a la solicitud de sentencia sumaria presentada por el Consejo, el 16 de agosto de 2024, Universal presentó una *Moción en Oposición a Moción de Sentencia Sumaria*.[5] En esta sostuvo que la solicitud de sentencia sumaria se debía denegar por las mismas razones por la cual se debía conceder la Solicitud de Sentencia Sumaria presentada por ellos. En específico por las siguientes razones: (1) que la reclamación del Consejo no estaba cubierta por el *Commercial Crime Coverage Form* de la póliza ya que

---

[5] Íd., págs. 317-332.

el señor García no era un "employee" bajo la definición que provee dicha póliza; (2) que el Consejo no contaba con prueba suficiente para demostrar que los actos imputados al señor García constituían un "theft" según definido bajo la póliza; y, por último (3) que la reclamación del Consejo estaba expresamente excluida bajo los términos y condiciones de la póliza.

En cuanto a la falta de prueba, expresó que los cheques presentados como parte de dicha solicitud de sentencia sumaria eran completamente ininteligibles lo que los hacía inadmisibles. Además, planteó que los cheques no fueron autenticados conforme las Reglas de Evidencia y que contenían declaraciones escritas de la persona que los preparó por lo que eran prueba de referencia inadmisible. Por las razones antes expuestas insistió que se debía denegar la solicitud de sentencia sumaria presentada por le Consejo.

Luego, el 16 de septiembre de 2024, el Consejo presentó una *Oposición a Moción de Sentencia Sumaria*.[6] En primer lugar, expuso que lo siguientes hechos que formuló Universal no estaban en controversia: 1-9, 11-22, 24-25, 27, 29, 31, 33-34, 36 y 38. A su vez discutió los que consideraba que estaban en controversia. Ante ello, argumentó que la póliza comercial proveía ocho (8) definiciones del término "employee" y considerando las definiciones establecidas, la póliza definía el término "employee" para los actos cometidos por el señor García. Por otro lado, a los efectos de que el Consejo no contaba con prueba suficiente para establecer su pérdida, indicó que presentó toda la evidencia que apoyaba la perdida incluyendo una serie de cheques a nombre de "petty cash" que el señor García cambió para su beneficio. Planteó que ese dinero no estaba presupuestado por el Consejo ni se utilizó para pagar deudas del Consejo. Por último, señaló que, cuando la póliza que expidió

---

[6] Íd., págs.333-344.

Universal hacía referencia a las palabras "you" o "your" se refería al Consejo. Puntualizó el sub inciso (1.a) en la sección denominada exclusiones cuando se refería a que no cubría actos cometidos por el asegurado designado, el puesto del presidente no estaba incluido por lo que los actos del señor García estaban cubiertos bajo la sección A-1 de la póliza. Considerando lo antes expuesto, argumentó que procedía denegar la solicitud de sentencia sumaria de universal.

Evaluadas las solicitudes de ambas partes, el 2 de diciembre de 2024, el TPI dictó una *Sentencia* que se notificó el 5 de diciembre de 2024.[7] En primer lugar, acogió como hechos materiales que no están en controversia los que propuso el Consejo en su solicitud de sentencia sumaria y los que aceptó Universal enumerados como 1-10, 23, 24, 26 y 27. Asimismo acogió los hechos núm. 11 y 12. En cuanto a los hechos propuestos como incontrovertidos en la solicitud de sentencia sumaria que presentó Universal, acogió los hechos aceptados por el Consejo, a saber, los hechos núm. 1-9, 11-22, 24, 25, 27, 29, 31, 33, 34, 36 y 38. De igual forma acogió el núm. 10 modificado para que leyera como sigue:

> 10. La Póliza 09-561-000607119-3/000 establece que a través de la Póliza las palabras "you" y "your" se refieren al "Named Insured showm in the Declarations".

De acuerdo con el derecho aplicable y a los hechos incontrovertidos acogidos, el TPI determinó lo siguiente:

> Ciertamente, la póliza requiere para proveer cubierta por hurto o por actos deshonestos que los mismos sean cometidos por un empleado del asegurado. Por tanto, resulta necesario adjudicar si el presidente del Consejo de Titulares, al cual se le imputan el alegado hurto o actuación deshonesta, era o no un empleado del asegurado. Este análisis debe estar integrado a la exclusión de cubierta cuando los actos de hurto o deshonestos son cometidos por "you" que, según vimos en la póliza, se refiere al asegurado nombrado que se muestra en las declaraciones (Named Insured shown in the Declarations). Compete entonces también adjudicar si los actos según alegados en la Demanda fueron cometidos por el asegurado Consejo de Titulares del Condominio Paseo del Rey a través de su entonces

---

[7] Íd., págs. 1-27.

presidente. En tal eventualidad aplicaría la exclusión. Para ello, debemos referirnos a las disposiciones de la Ley de Condominios sobre el rol del Presidente del Consejo de Titulares a quien se le imputan los actos de hurto/ deshonestos.

En la Ley de Condominios se establece que los miembros de la Junta de Directores, como lo es su Presidente, responden personalmente por sus acciones mientras actúen como tales cuando incurran en delito, fraude o negligencia crasa. Además, se establece que el presidente electo de la Junta de Directores "representará en juicio y fuera de él a la comunidad en los asuntos que la afecten... y que, en todo caso, se presumirá que el Presidente de la Junta de Directores cuenta con la autorización del Consejo de Titulares para comparecer a nombre de éste en los foros pertinentes". Ía. La Ley no cataloga como empleado al Presidente de la Junta de Directores del Consejo de Titulares. Como cuestión de hecho, no surge ni tan siquiera una alegación en la Demanda Enmendada a los fines de que las alegadas transacciones fraudulentas y/o deshonestas hubiesen sido realizadas por empleados del Consejo. Por el contrario, se alega que estas fueron realizadas por parte de algunos de los miembros de la pasada junta de directores del Consejo. No surge de la Ley de Condominios que los miembros de la Junta de Directores se consideran empleados del Consejo de Titulares, sino que estos son parte del Consejo en sí y actúan en su representación. Adviértase que de manera análoga a una corporación el Consejo tiene personalidad jurídica propia y actúa a través de personas que, según la Ley, son los miembros de la Junta de Directores como lo son el Presidente y Vicepresidente.

Además, el elemento de la remuneración es uno esencial para adjudicar el carácter de empleado del Consejo conforme la póliza. De la Demanda Enmendada tampoco existe una alegación que nos permita al menos establecer una controversia en torno a que el Presidente o alguno de los miembros de la pasada junta recibieran algún tipo de remuneración por sus gestiones como directores. Tras analizar la póliza objeto de este caso, los hechos acogidos y el derecho aplicable, este Tribunal concluye que el Presidente o los miembros de la pasada junta de directores del Consejo aquí demandante no son sus empleados, ni puedes ser catalogados como tal. Por tanto, los reclamos objeto de este caso no están cubiertos por la Póliza expedida por Universal.

En vista de lo anterior, declaró No Ha Lugar la *Solicitud sobre Sentencia Sumaria y Sentencia Declaratoria* que presentó el Consejo y Ha Lugar a la *Moción de Sentencia Sumaria* que presentó Universal. Consecuentemente, dictó Sentencia desestimando, sin perjuicio, la *Demanda* que presentó el Consejo.

En desacuerdo con este dictamen, el 27 de enero de 2025, el Consejo presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> **Erró el Tribunal de Primera Instancia al desestimar la Demanda y no resolver que los actos cometidos por el presidente están cubiertos bajo la Sección A.1 de la póliza.**

> **Erró el Tribunal de Primera Instancia al desestimar la demanda y no resolver que los actos cometidos por el presidente están cubiertos por la Sección A.5 de la póliza.**

Atendido el recurso, el 29 de enero de 2025, emitimos una *Resolución* concediéndole a Universal hasta el 18 de febrero de 2024 para presentar su alegato en oposición. Oportunamente, Universal presentó su *Alegato en Oposición a Alegación* y negó que el TPI cometiera los errores que el Consejo le imputó. Con el beneficio de la comparecencia de ambas partes procedemos a resolver el asunto ante nos. *Veamos.*

## II.

### -A-

En esencia, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho

esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Roldan Flores v. M. Cuebas,* 199 DPR 664, 676 (2018).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al., 185 DPR 288, 299 (2012).* Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una cuestión que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Aponte Valentín V. Pfizer Pharmaceuticals, LLC*, 208 DPR 263, 277 (2021).

En reiteradas ocasiones, el Tribunal Supremo ha establecido que se considera como un hecho esencial y pertinente, aquel que "puede afectar el resultado de la reclamación acorde con el derecho sustantivo aplicable". *Cruz Vélez v. CEE y otros*, 206 DPR 694, 745 (2021). Dicho esto, para que proceda una moción de sentencia sumaria no tan solo se requiere que haya una inexistencia de hechos en controversia, sino que también la sentencia que dicte el foro judicial tiene que proceder conforme al derecho sustantivo aplicable.

En particular, la Regla 36.2 de Procedimiento Civil, *supra*, permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su

favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Municipio de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 677 (2018). Por el contrario, esa persona viene obligada a enfrentar la moción de su adversatario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata- Rivera v. J.F. Montalvo,* 189 DPR 414, 432 (2013). Específicamente, la Regla 36.3 de Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria. Al amparo de dicha regla, la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.

Según dispone el caso de *Mejías et al. v. Carrasquillo et al.,* supra, pág. 300 citando a: *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 280-281 (1990), "al evaluar una moción de sentencia sumaria, los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en autos, sean o no parte de la solicitud de sentencia sumaria de los cuales surjan admisiones hechas por las partes".

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra,* 186 DPR 713, 757 (2012). Además, no se debe adjudicar un caso sumariamente cuando existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor credibilidad es esencial y está en disputa. *Const. Jose Carro v. Mun. Dorado,* 186 DPR 113, 129 (2012).

Ahora bien, según *Verá v. Dr. Bravo,* 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Lo anterior, debido a que "las partes no pueden añadir en apelación *exhibits*, deposiciones o affidávits que no fueron presentadas oportunamente en el foro de primera instancia, ni pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo". Íd. Además, sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al Tribunal de Primera Instancia. Íd.

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del foro primario en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su

oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

En Puerto Rico, el negocio de seguros está investido de un alto interés público, por ello ha sido reglamentado extensamente por el Estado. *Rivera Candela v. Universal Insurance Company,* 2024 TSPR 99, 214 DPR \_\_\_\_ (2024). Ello obedece a la complejidad, la importancia y el efecto que tiene nuestra economía en la sociedad. Íd**.** La Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como *Código de Seguros de Puerto Rico,* 26 LPRA sec. 101 *et seq.* (Código de Seguros), y el Código Civil –de manera supletoria– son las leyes que rigen las prácticas y requisitos de la industria de seguros. *Natal Cruz v. Santiago Negrón et al.,* 188 DPR 564, 575 (2013).

El contrato de seguros se define como "el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". Artículo 1.020 del Código de Seguros, 26 LPRA sec. 102. La relación entre una aseguradora y su asegurado es de naturaleza contractual y se rige por lo pactado en el contrato de seguro. *López v. Atlantic Southern Ins. Co.,* 158 DPR 562, 568 (2003). Los términos que se encuentran pactados en el contrato de seguros se encuentran por escrito en la póliza. *San Luis*

*Center Apartments v. Triple-S Propiedad*, Inc., 208 DPR 824, 832 (2022). De este modo, "el contrato de seguro deberá interpretarse a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125; *Carrasquillo Pérez v. Asociación de Titulares del Condominio Parque 352*, 2024 TSPR 101, 214 DPR ___ (2024).

Ahora bien, los términos de los contratos de seguro se consideran claros cuando utiliza un lenguaje especifico, sin que deje lugar a dudas o ambigüedades. *San Luis Apartments v. Triple-S Propiedad*, supra, pág. 832. Así pues, en ausencia de ambigüedad, se estará al sentido literal de sus palabras por lo que las partes estarán obligadas a cumplir con sus cláusulas y su contenido será ley entre las partes. Íd.

En lo pertinente al caso ante nos, la sección A (1) del documento intitulado *Commercial Crime Coverage Form* de la póliza establece lo siguiente:

> **A. Insuring Agreement**
> Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition E.1.k or E.1.I., which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition E.1.g.:
>
> **1. Employee Theft**
> We will pay for loss or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee" whether identified or not, acting alone or in collusion with other persons.

Ahora bien, para efectos de aclarar el significado de un "employee" dentro del contexto del inciso antes expuesto, el referido documento en su sección F (7) define el término "employee" como sigue:

7. Employee":

a. Means:

(1) Any natural person:

(a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by "employee".

(b) Whom you compensate directly by salary, wages or commissions; and

(c) Whom you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in paragraph 7.a.(1), who is on leave; or

(b) To meet seasonal or short-term workload conditions while that person is subject to your direction and control and performing services for you;

(3) Any natural person who is leased to you under written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph 7.a.(2):

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

(b) Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan"";

(5) Any natural person who is a former "employee", partner, "member", "manager",

director or trustee retained by you as consultant while performing services for you;

(6) Any natural person who is a guest student or intern pursuing studies or duties;

(7) Any natural person employed by an entity merged or consolidated with you prior to the effective date of this Policy; and

(8) Any natural person who is your "manager", director or trustee while:

(a) Performing acts within the scope of the usual duties of an "employee"; or

(b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished form general, directorial acts on your behalf.

Por otro lado, en cuanto al hurto fuera de las facilidades, según la sección A (5), Universal indemnizará por esta pérdida en las siguientes instancias:

**5. Outside the Premises**

We will pay for:

a. Loss of "money" or "securities" outside de "premieses in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. Loss or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

La póliza define "messenger" de la siguiente manera: "means you or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises". Por otra parte, el término "member" se define como sigue: "means an owner of limited liability company represented by its membership interest who, if a natural person, may also serve as "manager".

Dicho lo anterior, cabe precisar que, las pólizas contienen cláusulas de exclusión que tienen el propósito de "limitar la cubierta

de una póliza al disponer que el asegurador no responderá por ciertos eventos, riesgos o peligros allí contenidos. *Carrasquillo Pérez v. Asociación de Titulares del Condominio Parque 352,* supra. Es por ello que las cubiertas se circunscriben a "determinadas actividades específicamente delimitadas en la póliza conjuntamente con las exclusiones allí dispuestas, donde se exceptúan ciertas actividades por las que no viene obligado a indemnizar". Íd. Ahora bien, dichas cláusulas son desfavorecidas ya que el fundamento principal de un seguro es proveer protección a los asegurados por lo que los tribunales deberán interpretar dichas cláusulas restrictivamente contra el asegurador. Íd. Sin embargo, en aquellos casos que las cláusulas son claras y apliquen a determinada situación, la aseguradora no estará obligada a responder por aquellos riesgos expresamente excluidos. Íd. En la póliza el presente caso, la sección D (1) establece la siguiente exclusión que es pertinente al caso ante nos:

> D. Exclusions:
>
> > 1. This insurance does not cover:
> >
> > > (a) Acts Committed by you, Your Partners or Your Members
> > >
> > > Loss resulting from "theft" or any other dishonest act committed by:
> > >
> > > (1) You; or
> > >
> > > (2) Any of your partners or "members"; whether acting alone or in collusion with other persons.

**-C-**

La Ley Núm. 104 de 25 de junio de 1958, según enmendada, mejor conocida como *Ley de Condominios*, 31 LPRA sec. 1291 *et seq.* preceptuaba todo lo relativo al régimen de propiedad horizontal. Sin embargo, esta fue derogada por la Ley Núm. 129-2020, según enmendada, mejor conocida como *Ley de Condominios de Puerto Rico*, 31 LPRA sec. 1921 *et seq.* (Ley Núm. 129-2020), aplicable al

presente caso. Dicha Ley se creó con el fin de establecer un régimen jurídico atemperado a los cambios sociológicos que ha experimentado nuestro país y para facilitar la vida en convivencia. Exposición de Motivos, Ley Núm. 129-2020, *supra*.

En lo pertinente al caso ante nos, el Art. 48 de la referida ley, 31 LPRA sec. 1922t, define el Consejo de Titulares como sigue:

> El Consejo de Titulares constituye la autoridad suprema sobre la administración del inmueble sometido al Régimen de Propiedad Horizontal. Estará integrado por todos los titulares. Sus resoluciones y acuerdos, adoptados en asambleas debidamente convocadas y constituidas, serán de ineludible cumplimiento por todos y cada uno de los titulares, ocupantes o residentes y demás personas que se relacionen con el condominio.

Ahora bien, el Consejo de Titulares posee por virtud de la Ley Núm. 129-2020, *supra*, unos poderes y deberes, entre estos, el escoger una Junta de Directores cuando concurran más de veinticinco (25) titulares en el condominio. Art. 49 de la Ley Núm. 129-2020, 31 LPRA sec. 1922u. Deberán elegirse al menos un presidente, un secretario y un tesorero para que compongan dicha Junta de Directores. Íd. Particularmente, el presidente de la Junta de Directores "representará en juicio y fuera de él a la comunidad en los asuntos que la afecten y presidirá las asambleas del Consejo de Titulares".

III.

En este recurso, el Consejo impugnó una *Sentencia* que el TPI dictó el 2 de diciembre de 2024 mediante la cual declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó Universal y No Ha Lugar la *Solicitud Sobre Sentencia y Sentencia Declaratoria* del Consejo. En consecuencia, desestimó, con perjuicio, la *Demanda* presentada por el Consejo. Particularmente, en sus dos (2) señalamientos de error, en síntesis, sostuvo que, el TPI erró al desestimar la *Demanda* y no resolver que los actos cometidos por el señor García estaban cubiertos bajo la Sección A.1 y A.5 de la póliza.

Previo a discutir los señalamientos de error antes reseñados, cabe precisar que, al momento de revisar la concesión de una solicitud de sentencia sumaria, nos encontramos en la misma posición que el TPI. Así pues, en primer lugar, debemos evaluar si al presentar la solicitud de sentencia sumaria y su oposición las partes cumplieron con los requisitos de forma establecidos en la Regla 36.3 de Procedimiento Civil, *supra*, y con los dispuesto en *SLG Zapata-Rivera v. J.F. Montalvo, supra*. Al evaluar los escritos presentados por las partes resolvemos que, en esencia, ambas cumplieron con los referidos requisitos. Resuelto lo anterior, nos corresponde evaluar si existen hechos materiales en controversia que nos impidan dictar sentencia sumaria. *Veamos.*

En su dictamen el TPI acogió cuarenta y siete (47) hechos incontrovertidos que expusieron las partes en sus mociones de sentencia sumaria las cuales procederemos resumir y a adoptar en su totalidad. Univeral suscribió dos (2) pólizas a favor de la Asociación de Residentes Condominio Paseo del Rey, también conocida por el nombre Consejo de Titulares del Condominio Paseo del Rey. Las fechas de efectividad de las referidas pólizas eran desde el 7 de septiembre de 2019 al 7 de septiembre de 2020. La póliza núm. DOL 990-00824 proveía cubierta tipo "Directors and Officers Liability (Individual)" y "Directors and Officers liability (Reimbursement)". Por otro lado, la póliza núm. 09-561-000607119-03/000 proveía cubierta para propiedad comercial, responsabilidad pública y crimen comercial y fidelidad.

Particularmente, la póliza sobre Crimen y Fidelidad estaba compuesta por un endoso intitulado *Comercial Crime Covarage Form.* El inciso A(1) de este endoso, establecía lo siguiente: "We Will pay for loss or damage to "money", "securities" and "other property" resulting directly from theft committed by an "employee", whether identified or not, acting alone or in collusion with other persons. For

the purposes of this Insuring Agreement, "theft" shall also include forgery". Además, el inciso A (5) disponía lo siguiente:  We will pay for: a. Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction. Asismismo, el inciso F(7) exponía ocho (8) definiciones del término "employee". Ahora bien, como parte de sus exclusiones, el *Comercial Crime Covarage Form* establecía que el seguro no cubría lo siguiente: Loss resulting from "theft" or any other dishonest act committed by: (1) You; or (2) Any of your partners or "members"; Whether acting alone or in collusion with other persons."

En el mes de octubre del 2019, los miembros de la Junta de Directores del Consejo presentaron su renuncia y en noviembre del 2019, el Consejo escogió una nueva Junta de Directores. Este Junta de Directores entrante descubrió que el señor García y el Sr. Reinaldo Flores, miembros de la Junta de Directores pasada, emitieron cheques a nombre de "cash" o "petty cash" sin haber evidencia de pago. Estos cheques pertenecían al Consejo. Ante ello, el nuevo Consejo presentó una reclamación ante Universal por las pérdidas sufridas como resultado de los actos deshonestos cometidos por los miembros antes mencionados.

Tras haber evaluado la reclamación, Universal remitió una carta al Consejo denegando la reclamación. Entre las razones para denegar la reclamación, Universal mencionó la Sección A(1) antes citada y sostuvo que el señor García no era empleado según lo definía la póliza. Particularmente, puntualizaron que el señor García: (1) no recibía sueldo ni renumeración por sus labores como presidente y vicepresidente del Consejo; (2) no tenía supervisor ni existía un puesto superior al suyo en la directiva del Consejo; y por último (3) no participaba como presidente del Consejo como parte

de un contrato con una compañía encargada de la administración del edificio.

Luego de revisar la totalidad del expediente, examinado los argumentos de ambas partes y aquilatada la prueba documental que obra en el expediente, concluimos que no existe hechos sustanciales en controversia que nos impida dictar sentencia sumaria. Por tal motivo nos resta determinar si el TPI aplicó el derecho correctamente.

En esencia, en el dictamen recurrido, el TPI determinó que el señor García, presidente de la pasada Junta de Directores, no era un empleado ni podía ser catalogado como tal según lo definía la póliza. Así pues, concluyó que los reclamos sobre los presuntos actos de hurto o deshonestos por parte del señor García no eran cubiertos bajo la póliza. Específicamente, explicó que, para proveer cubierta, la póliza requería que los actos de hurto o deshonestos fueran cometidos por un empleado del asegurado. Ante ello, sostuvo que no surgía de la Ley de Condominios que los miembros de la Junta de Directores se consideraran empleados del Consejo de Titulares, sino que estos eran parte del Consejo en sí y actuaban en su representación. Además, añadió que la remuneración era esencial para adjudicar el carácter de empleado del Consejo según la póliza y que del expediente no surgía que los miembros de la pasada junta recibieran remuneración por sus gestiones. Así pues, resolvió que los actos reclamados en el presente pleito no eran actos cubiertos bajo la póliza en cuestión.

Evaluada la determinación del TPI conforme al derecho aplicable, no encontramos que dicho foro haya errado en sus conclusiones de derecho. Así pues, concluimos que tanto las determinaciones de hechos como las conclusiones de derecho del TPI estuvieron basadas en la prueba documental y de conformidad al derecho aplicable por lo que debemos sostener sus

determinaciones. Máxime, cuando no encontramos en las actuaciones de dicho foro la existencia de pasión, prejuicio, parcialidad o error manifiesto. De este modo, no se cometió el primero ni el segundo señalamiento de error.

IV.

Por los fundamentos antes expuestos, ***confirmamos*** el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda.  Lilia M. Oquendo Solís<br>Secretaria del Tribunal de Apelaciones